2023 IL App (4th) 220919-U
Nos. 4-22-0919, 4-22-0920, & 4-22-0921 cons.
Order filed March 13, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* L.S., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 20-JA-140 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. D.S., Respondent-Appellant). | ) | Judge, Presiding. |

| | | |
|---|---|---|
| *In re* A.S., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 20-JA-141 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. D.S., Respondent-Appellant). | ) | Judge, Presiding. |

| | | |
|---|---|---|
| *In re* R.S., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 20-JA-142 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. D.S., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*:     The trial court's decision to change the permanency goal from return home within 12 months to substitute care pending termination of respondent's parental rights was not contrary to the manifest weight of the evidence. Respondent forfeited the issue of whether it was in the children's best interests to terminate his parental rights; notwithstanding forfeiture of this issue, the trial court's decision was not against the manifest weight of the evidence.

¶ 2     Respondent appeals the trial court's decision in this termination case to change the permanency goal from return home within 12 months to substitute care pending termination of respondent's parental rights after the fourth permanency review hearing. Respondent also raised, but did not argue in his brief, the issue of the trial court's determination that it was in the children's best interests to terminate his parental rights. For the following reasons, we affirm.

¶ 3                                    I.  BACKGROUND

¶ 4     Respondent, D.S., is the biological father of L.S., born in 2019; A.S., born in 2018; and R.S., born in 2017. His parental rights were terminated on October 12, 2022. The parental rights of the children's mother were also terminated in the same proceedings but are not at issue in this appeal.

¶ 5                              A.  NEGLECT PETITIONS

¶ 6     On May 13, 2020, the State filed three separate neglect petitions alleging that 10-month-old L.S., two-year-old A.S., and two-year-old R.S. were neglected minors pursuant to section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2020)). The allegations in all three petitions were the same, alleging that the children were neglected minors because (1) their environment was injurious to their welfare in that their mother's substance-abuse issue prevented her from properly parenting them, thereby placing the children at risk of harm; (2) their

environment was injurious to their welfare due to their father's substance-abuse issue which prevented him from properly parenting the children, thereby placing them at risk of harm, and (3) their environment was injurious to their welfare in that the children resided in a home where domestic violence occurred, thereby placing them at risk of harm. See 705 ILCS 405/2-3(1)(b) (West 2020). Amended petitions were filed on June 30, 2020, to correct the mother's date of birth.

¶ 7 This case originated when the Department of Children and Family Services (DCFS) received a hotline report describing numerous concerns about the safety and well-being of the children. It was reported that on the evening of March 27, 2020, the mother returned to the family home after work around 8:30 p.m. and was unable to get into the home. Respondent was "passed out" in the home with all three children, and after 45 minutes, the reporter had to help "bust in" the door to gain entry. R.S. and A.S. were found inside a gated section of the living room, they were naked and there was human feces all over the walls. L.S. was found in a bedroom sitting in a baby swing. She was crying and wearing a full diaper that appeared to have not been changed for a day. The home was dirty, smelled of cat urine, and there was a bowl of marijuana on the kitchen table. Respondent is reportedly an alcoholic, and the mother leaves the children with him while she goes to work. It was reported that respondent will throw dry cereal on the floor for the children to eat. The mother disregarded the reporter's suggestion to take the children and leave. The reporter stated that the children are often left on their own and unsupervised, with the boys, A.S. and R.S., confined to a gated area in the family room, while L.S. is left alone in the bedroom sitting in a crib or a baby swing. The reporter stated that the parents are known to use ecstasy and marijuana. Respondent also reportedly has a history of cocaine and heroin use. The reporter asserted that there is an ongoing problem of domestic violence between the parents. There were holes in the walls and doors. Respondent was arrested on March 24, 2020, for domestic violence

against his father. He had previously been arrested in October 2019 for battering the mother while the children were present.

¶ 8     A shelter-care hearing on the neglect petitions was held on June 30, 2020. The court found there was probable cause that the children were neglected and there was an immediate and urgent necessity, despite the State's reasonable efforts, for removal of the children from respondent's care. Steven Whitmore was appointed as guardian *ad litem* (GAL). The children were placed in the care of their paternal grandmother, C.M., and step-grandfather, B.M.

¶ 9                           B.  ADJUDICATIONS AND DISPOSITIONS

¶ 10    At the adjudication hearing held on September 17, 2020, the court approved an agreement reached between the parties as follows:  respondent stipulated to count 2 of the neglect petitions (the children's environment was injurious to their welfare due to respondent's substance abuse), the State voluntarily dismissed the other two counts, and respondent agreed to be required to complete services based on all counts. Upon adjudicating the children neglected minors, the court moved directly to the dispositional proceedings.  The court found respondent unable, but not unwilling, to properly care for, protect, train, or discipline the children.  The court ordered DCFS to retain guardianship and custody of the minors.  Respondent was ordered to cooperate with DCFS and its contracting agencies, including complying with all drug, alcohol, and psychological treatment and services.  Visitation was to remain at the discretion of DCFS.

¶ 11                          C.  PERMANENCY REVIEWS

¶ 12    The first permanency-review hearing was held on March 29, 2021.  The permanency-review report indicated that respondent had not been compliant with services.  He failed to attend two referrals for a parenting-intake interview and made no efforts to complete substance-abuse or domestic-violence assessments.  Respondent did not have a stable residence; he reported that he

had been living in motels. Despite numerous attempts in January, February, and March of 2021, the caseworker was unable to contact or meet with respondent. In January, respondent was arrested and spent a weekend in jail for violation of a no-contact order and domestic violence against his father. Respondent had weekly supervised in-person and virtual visitation with the children, but his attendance was very inconsistent. He did not appear for virtual visitation. Respondent showed little interest in making up missed visits. When respondent stated that his work schedule was the reason for missing two visits in January and all visits in February, the case worker asked him about alternative times that would work for visitation. However, respondent did not reply. Respondent displays a nurturing relationship with his children and shows some interest in their activities, but he is described as supervising the children rather than engaging with them during visits. The report concluded that respondent had not made reasonable efforts or progress toward the goal of returning the children to his care. The report recommended the permanency goal remain return home within 12 months. The reported noted that respondent had not progressed in his goals to safely care for the children by himself, noting that "[h]is parenting capacities, as well as his continued use of violence, are a barrier to reunification with him as a primary caretaker."

¶ 13   No witnesses testified at the permanency-review hearing. After reviewing the report and hearing counsels' arguments, the court found that respondent had not made reasonable efforts or progress toward reunification and maintained the goal of return home in 12 months.

¶ 14   The next permanency-review hearing was held on September 27, 2021. The permanency-review report revealed that respondent "almost finished parenting classes but dropped out at the end." Respondent was engaged in the Partner Abuse Intervention Program (PAIP), but the service provider shut down and respondent did not want to go to another provider. Respondent completed a substance-abuse assessment and was deferred, but he was informed he must complete another

assessment after testing positive for marijuana. Respondent was referred to Lutheran Social Services of Illinois (LSSI) for individual counseling to address concerns regarding protective parenting and the chronic neglect suffered by the children, but respondent believed it was not necessary and "did not want to hear" what the LSSI worker had to say. The report noted that when the children came into care, they were nonverbal and were often kept in separate rooms away from one another. The conditions of the home were substandard, the children were provided minimal parenting, and they lacked interaction with one another. R.S. had heart surgery after his birth and his parents did not follow up with appropriate medical care. Respondent "continues to minimize this and feels [DCFS] overreached by taking their children into care." Respondent originally had two hours of weekly visitation which later was decreased to one hour. When respondent's visits became irregular and he missed multiple consecutive visits, LSSI suspended visitation. Respondent's behavior, mood, communication, and discipline techniques were described as poor. During one visit, respondent got upset with his children because they were not listening, and he told them they needed to be placed in a dog cage. When the caseworker corrected him, respondent decided to leave and told the caseworker to "f*** off" as he walked out. The report stated that respondent needs to retake parenting classes and he may need parenting coaching to develop skills for parenting children with special needs. Respondent refused to participate in individual counseling. The report concluded that respondent had not made reasonable efforts or progress, but the goal should remain return home in 12 months.

¶ 15    At the hearing, respondent proffered that he participated in the PAIP and had only six classes left to complete before that service was shut down. He did not believe he should have to start over at another provider, and he had looked into the possibility of completing domestic-violence classes at the YWCA. He also proffered that some information about his progress has

been lost because there have been four different caseworkers assigned to this matter. Thereafter, the court found respondent had not made reasonable efforts or progress during this review period and maintained the goal of return home in 12 months.

¶ 16    After two continuances, the next permanency-review hearing was held on March 28, 2022. Two permanency-review reports were filed with the court, one dated February 11, 2022, and one dated March 21, 2022. The February report provided that respondent did not complete parenting classes. He was actively engaged in the PAIP, but the service provider shut down, and respondent did not want to start over with another provider. Respondent tested positive for marijuana and missed some additional random drug tests. He was, therefore, told he must compete another substance-abuse assessment. Respondent was again referred for individual counseling, but he reportedly stated that he still feels it is unnecessary. He did not participate in the last Administrative Case Review (ACR). His visitation remained suspended. The March report indicated that respondent had completed inpatient substance-abuse treatment and when he was discharged in February 2022, he moved into a sober-living facility. The report provided that respondent appeared motivated to continue with services and was scheduled to start outpatient mental health services at Rosecrance on March 31, 2022. Respondent stated that he stopped visiting his children because he "wasn't in a good place, due to his substance addiction." However, he had virtual visits with them while in treatment and planned to recommence visitation in March for one hour per week. The March report recommended that respondent be found to have made reasonable efforts, but not reasonable progress during this review period.

¶ 17    At the hearing, Ashley Bryer testified. She is an addiction counselor at Rosecrance. She began meeting with respondent in January when he entered their inpatient substance-abuse treatment program. He completed a 29- or 30-day inpatient program in February 2022. Bryer

testified regarding respondent's treatment for alcohol addiction. She testified that respondent became more open and engaged over time while in the program and they worked on the first 2 steps of the 12-step program. On cross-examination, Bryer stated that respondent's prognosis was guarded, and he was recommended to live in a sober living environment where he would participate in an outpatient program, psychiatric treatment, and regular 12-step meetings. Bryer acknowledged that she had not had any contact with respondent since he was discharged from the inpatient program and did not know if he complied with those recommendations.

¶ 18   Respondent testified on his own behalf at the hearing. He stated that he began engaging in services in January at Rosecrance when he entered an inpatient treatment program. He described his experience and explained the most impactful part of the program was "learning about my disease and learning all the, learning all the coping skills and the tools I can use to control it." He testified that because of his drinking, he did not realize he suffered from depression until he was in treatment. He began taking Zoloft which he believes has helped manage his anxiety and depression. He admitted that his addiction "overpowered" his mind for many years. He did not take care of his children properly and was "passed out drunk with them a couple of times" while they were in his care. Through treatment, he realized the need for change in his relationship with his children and he wants to be "the father they deserve." He testified that he has a job and works 47 to 53 hours per week. He is working a 12-step recovery program and attends meetings five times a week. He was residing in a sober-living house with six other men who support one another in their recovery. He stated that he had an appointment to meet with an individual therapist on March 31, 2022. He stated that he was assigned a psychiatrist after leaving inpatient treatment, but he could not remember his name. Respondent testified that he started parenting classes last year, but he admitted that he dropped out of them because he started drinking heavily again. He

intends to re-enroll in parenting classes and believes his experience will be different now that he is sober. On cross-examination, respondent testified that he had been employed at his current job since March 3, 2022. He was supposed to recommence visitation with the children the prior week but had not done so due to scheduling issues. He stated that he had been sober for 79 days.

¶ 19 At the conclusion of the hearing, the court found respondent had made reasonable efforts and progress towards the goal of reunification. The court maintained the goal of return home within 12 months. The court admonished respondent that he needed to get back to regular visitation with the children and that there needed to be an assessment of his parenting skills.

¶ 20 The next permanency-review hearing was held on July 8, 2022. Neither parent was present for the hearing. The court took judicial notice of the permanency-review report and service plan both dated July 1, 2022, and a communication from C.M., the grandmother/foster mother, dated July 4, 2022. The report indicated that respondent was engaged in services and in close contact with the caseworker in April and May. He was scheduled to begin parenting classes in June. However, he had not signed the consent forms to allow his caseworker to collect records or speak with his service providers to confirm his progress. In June, respondent became less involved with the caseworker and his children. He missed "a few" visits, missed a random drug test, and did not attend the ACR on June 16. He sent the caseworker a text message explaining that he had been very busy. Respondent had not moved beyond supervised visitation with the children because he has not completed services, most notably parenting classes. The report recommended that respondent be found to have made reasonable efforts but not reasonable progress toward the goal of reunification and that the goal remain return home within 12 months.

¶ 21 The communication dated July 4, 2022, from C.M. revealed that respondent had missed numerous visits during the review period, participating in only five of the weekly visits during the

three-month review period. C.M. stated that respondent has not established "any kind of relationship with these children or really even attempted to." She continued, "[t]hey barely know him and he definitely does not know them." She stated that she believes that the children are not a priority to respondent. He admitted to a relapse in his alcohol use that resulted in him losing his job and being "kicked out" of his sober living housing for "a couple of days." She questioned whether he was responsible enough to care for three young children who have developmental issues.

¶ 22 The State recommended that a decision regarding respondent's reasonable efforts be deferred and that he be found to not have made reasonable progress. The State noted that there were no records to show he was actually participating in services, including counseling or parenting classes, and he had missed a "significant number of visits." The State noted that respondent had "fallen off" taking an active role in parenting the children or communicating with his case worker. The State recommended the goal remain return home within 12 months, but the State asserted that a different goal may be considered in the near future.

¶ 23 Respondent's counsel argued that the "only unsatisfactories" respondent had in the service plan were for "parenting, only for parenting – parenting skills, protective parenting skills, completing his parenting classes." He argued that respondent completed other services and suggested that the caseworker was not making reasonable efforts to ensure that the consents were signed. He asked that the court find respondent made reasonable efforts and defer the decision regarding reasonable progress. He acknowledged respondent needs to be more consistent with visitation and engaged in parenting.

¶ 24 The GAL argued that he was concerned that the children have been in care for a very long time. He noted that at the time of the last court date, respondent was celebrating 79 days sober

and that was two years after the date of the incident that caused the case to come into care. Since then, respondent has had a relapse and stopped engaging with the children, including cancelling numerous scheduled visits. He said that "changing the goal is clearly on my radar" but wanted to give respondent one more chance, so he asked the court to defer efforts, find respondent has not made reasonable progress, and maintain the goal of return home in 12 months.

¶ 25 The court found respondent had not made reasonable efforts or reasonable progress toward reunification. The court declined to defer the decision on efforts. The court noted that respondent missed random drug tests on June 8 and July 1. The court expressed concern about respondent's reasons for missing visitation, stating "I don't think he probably provided any verification to anybody that he was sick and I wouldn't be surprised if those were substance related." Commenting further regarding its skepticism regarding respondent's commitment to visitation, the court noted that the foster mother had offered virtual visits as an alternative and stating further "this is not a traditional placement where if you miss a visit there's no flexibility and you miss it. This person has been very flexible." The court changed the goal to substitute care pending termination of parental rights, noting that it had been two years since the disposition in the case and explaining "I don't want to waste any more time on what I am coming to believe is a lost cause."

¶ 26 D. TERMINATION PROCEEDINGS

¶ 27 On August 11, 2022, the State filed three separate motions to terminate respondent's parental rights. The motions contained the same four counts: respondent failed to maintain a reasonable degree of interest, concern, and responsibility as to the children's welfare (count 1) (750 ILCS 50/1(D)(b) (West 2020)); respondent failed to protect the children from an environment injurious to their welfare (count 2) (750 ILCS 50/1(D)(g) (West 2020)); respondent failed to make

reasonable efforts to correct the conditions that caused the children to be removed during the nine-month period after the adjudication of neglect, from December 27, 2020, through September 27, 2021 (count 3) (750 ILCS 50/1(D)(m)(i) (West 2020)); and respondent failed to make reasonable progress toward the return of the children during a nine-month period after adjudication of neglect, from December 27, 2020, through September 27, 2021 (count 4) (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 28   The unfitness phase of the proceedings to terminate respondent's parental rights commenced on September 12, 2022.

¶ 29   The trial court took judicial notice of numerous documents and prior orders entered in this case, including the amended neglect petitions, the temporary custody order, the adjudication order, the disposition order, and the four permanency-review orders. The court admitted into evidence a certified copy of the indicated packet, the integrated assessment approved on December 11, 2020, and four service plans that were prepared throughout the case, dated September 7, 2020, December 14, 2020, December 15, 2021, and June 6, 2022.

¶ 30   The State called Amy McChesney as its only witness. McChesney testified that she was a case manager with LSSI and was assigned to this case around January 2021. She testified that respondent was recommended to complete a substance-abuse assessment and services, a mental-health assessment, individual counseling, the PAIP services for domestic violence, and parenting classes. When she was first assigned to the case, respondent seemed to be engaged and was working toward recommencing visitation with his children. He had previously completed a substance-abuse assessment which indicated he did not need services, but he subsequently tested positive for marijuana. McChesney testified that respondent was referred for individual counseling, but he did not engage in those services because he did not feel he needed counseling.

She stated that she was informed in December 2021 that respondent planned to complete a mental-health assessment, but she had no verification that he had done so. McChesney testified that she repeatedly admonished respondent via text message that he needed to sign the consents and provide records regarding his engagement in services, but he failed to do so. She acknowledged that she had concerns regarding domestic violence based on the case history.

¶ 31 McChesney testified that LSSI has concerns regarding respondent's substance abuse. Respondent was supposed to take a random drug test once per month. He missed numerous drug tests throughout the pendency of this case and tested positive for one in June 2021. In January 2022, she received documentation that respondent participated in an inpatient-treatment program at Rosecrance. McChesney testified that respondent sent her an email admitting to relapsing with substance abuse three weeks prior to the hearing. She testified that LSSI also has concerns regarding respondent's parenting ability, noting that the case was opened due to lack of supervision, a poor living environment, substance abuse, and domestic violence. These concerns along with the observations of respondent with the children call into question his parenting abilities. She explained that observations during visitations did not show much improvement regarding his ability to communicate with the children, use appropriate language, or properly discipline and redirect them. She stated her biggest concerns were respondent's lack of parenting skills given that there are three children all with behavioral issues and special needs. She explained that A.S. and R.S. have special needs due to developmental and cognitive delays. R.S. was born with a heart defect and has some medical issues. McChesney stated that respondent participated in parenting classes at one point, but he did not complete the program. Respondent was referred to another parenting program, but she had no proof that he ever attended because at that time, in spring of 2022, she lost contact with respondent.

¶ 32   McChesney further testified that respondent did participate in visitation, though he did not do so regularly.  At some time after April or May, he stopped attending.  She stated that the visits often did not "go well."  Respondent never progressed to unsupervised visitation because he did not complete the required services.  On cross-examination, McChesney stated that the children were excited to see respondent when they had visits with him.  She testified that the children need routine and when respondent misses visits, it confuses them.

¶ 33    Respondent testified on his own behalf.  He stated that he currently resides as an inpatient at Rosecrance and has been there since August 15, 2022.  He stated that he had a relapse with alcohol use in July and "went on like a month-and-a-half bender and finally brought myself to come back into Rosecrance."  He testified that he previously was in the same program from January to February 2022 and he entered the program at that time after being arrested for driving under the influence. He explained that he relapsed because he started focusing more on work and not on his recovery.  He acknowledged that he relapsed in May as well but explained that it was "only like two days and I was fine."  Respondent testified that he competed domestic-violence counseling at the YWCA.  He admitted that he stopped going to parenting classes in June 2021, but he could not recall why he stopped attending.  Regarding visitation, he testified that "during my addiction phase, [visits] didn't go so well; but after I got out of rehab in February, I thought they were going pretty good."  Respondent testified that he missed numerous visits between March and July.  He gave numerous excuses for missing visits, including car trouble, illness, and oversleeping.  However, he also admitted that he did not always give notice or reasons for missing.

¶ 34   On October 12, 2022, the court rendered its decision, finding that the State had met its burden of proving respondent unfit on all four counts alleged in the motions for termination of parental rights. The court detailed the evidence presented in the case to support its determination.

¶ 35 The court moved directly to the best-interest phase of the termination proceedings. The State asked the court to take judicial notice of the fitness proceedings and the best interests report filed by DCFS on October 6, 2022. The court did so with no objection.

¶ 36 The best interests report stated that the children, R.S., who is now five years old, A.S., who is four years old, and L.S., who is three years old, have lived with their paternal grandparents since March of 2020. The live in a five-bedroom home in a quiet neighborhood. The children are very attached to their grandparents, who provide them with a loving and secure home. The family maintains a connection and strong relationships with their extended family and the community. The children experienced neglect while in the care of their parents, and R.S. and A.S. demonstrate significant developmental delays and are in specialized care. The grandparents are diligent about ensuring that the children's needs are met, including special services such as speech and occupational therapy. The grandparents and the children are involved in community activities, and the children participate in scouting, basketball, and swimming lessons. R.S. attends kindergarten, A.S. attends preschool, and L.S. will soon be attending preschool. The grandparents are willing and able to provide permanency for the children.

¶ 37 Respondent testified on his own behalf. He stated that he completed inpatient treatment at Rosecrance twice this year. He testified that his second round of inpatient treatment "went really well" and he "learned a lot more from the second time than [he] did the first time." He testified that he sees a therapist. He stated that he is currently living in a sober living facility. When asked if he felt he would be able to be a good father to his children, he responded "I do feel like I could, but at this time I cannot." On cross-examination, respondent stated that his children currently live with his parents. He stated that he is trying to repair his relationship with his parents which suffered because of his addiction. He acknowledged that his parents provide for all of his

children's daily needs and have consistently taken care of them. He admitted that his children look to their grandparents for care, love, and support.

¶ 38    The GAL called B.M. to testify. B.M. is the step-grandfather and foster parent of the three children in this case. He testified that the children have lived with him and his wife for approximately two and a half years. During this time, they have provided for their needs and given them love and affection. B.M. stated that his two children live with them as well and have developed connections with the children. B.M. testified that he and his wife are committed to the long-term care and safety of the children. He testified that he would consider allowing respondent to continue to have a relationship with the children in a safe and appropriate manner. He agreed that respondent would have to remain clean and sober to be a part of the children's lives.

¶ 39    After hearing the arguments of the parties, the court found that the State proved by a preponderance of the evidence that it was in the children's best interest to terminate respondent's parental rights. In reaching this decision, the court stated respondent testified "very credibly and very honestly" and admitted "at this point he is not in a position to protect, train, and discipline and assume responsibility for these children." The court noted that one of the factors it must consider is permanency for the children and that the children have lived with their grandparents for over two years and have been integrated into the family. The court noted that respondent's struggle with addiction is "in its infancy" and if the grandparents choose to adopt the children, the court took comfort in knowing that the children will know their biological father while living in a safe environment.

¶ 40    This appeal followed.[1]

_____

[1]This appeal was transferred from the Fourth District to the Second District pursuant to Illinois Supreme Court Order M.R. 31650 (eff. Feb. 6, 2023).

¶ 41                                      II. ANALYSIS

¶ 42     At issue in this appeal is whether the trial court erred in changing the permanency goal to substitute care pending termination of respondent's parental rights after the fourth permanency review hearing on July 8, 2022.

¶ 43     The purpose of the Act (705 ILCS 405/1-1 *et seq.* (West 2020)) is to ensure that a child brought into care under the Act is provided the "care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community." 705 ILCS 405/1-2(1)(West 2020). If a child is removed from the custody of his or her parent, DCFS is directed to immediately consider concurrent planning so that permanency may occur at the earliest possible opportunity. 705 ILCS 405/1-2(1) (West 2020).

¶ 44     Under section 2-28(2) of the Act, a juvenile court is authorized to hold permanency-review hearings until the service plan and permanency goal have been achieved. 705 ILCS 405/2-28(2) (West 2020). "The court shall set a permanency goal that is in the best interest of the child." 705 ILCS 405/2-28(2) (West 2020). In setting the permanency goal, courts consider the following factors: (1) the age of the child; (2) the options available for permanence; (3) the current placement and intent of the family regarding adoption; (4) the emotional, physical, and mental status or condition of the child; (5) types of services offered, whether the services were successful, and the reasons if services failed; (6) availability of services currently needed; and (7) the status of the child's siblings. 705 ILCS 405/2-28(2) (West 2020). Permanency-review hearings may include a review of the efforts made toward achieving the permanency goal and service plan. "[W]hen a trial court establishes a permanency goal at a permanency review hearing, its decision will not be reversed unless it is against the manifest weight of the evidence." *In re J.B.,* 311 Ill. App. 3d 868, 870 (2000). A decision is against the manifest weight of the evidence only if the opposite

conclusion is clearly evident. *In re S.K.B.,* 2015 IL App (1st) 151248, ¶ 28. "In child custody cases, even deeper deference is given to the trial judge than under the familiar manifest weight of the evidence standard because of the delicacy and difficulty of the cases." *In re S.K.B.,* 2015 IL App (1st) 151248, ¶ 28 (citing *In re N.T.,* 2015 IL App (1st) 142391, ¶ 27).

¶ 45    Respondent argues that the trial court's decision to change the permanency goal from return home within 12 months to substitute care pending termination of parental rights was not supported by the evidence. He contends that the service plan showed that he was making progress and cooperating with DCFS. He argues that he "remained sober and active in services for most of the 3 months between the 2 permanency reviews." He contends that there was no evidence offered by the State to justify changing the goal, and the trial court did not have the authority to, *sua sponte,* change the permanency goal.

¶ 46    First, we address respondent's contention that the trial court lacked the authority to change the permanency goal on its own accord. The court in *In re K.H.,* 313 Ill. App. 3d 675, 680 (2000) held that the plain language of the Act "does not require the trial court's selection of a permanency goal be conditioned upon a prior filing of a petition to terminate parental rights by the State." Rather, the Act enumerates the available permanency goals, and mandates several factors to be considered by the trial court in establishing that goal. See 705 ILCS 405/2-28(2) (West 2020). This defined set of factors contains no requirement that there be any prior action or filing by either party for the court to set a permanency goal at a permanency hearing. See *In re K.H.,* 313 Ill. App. 3d 675, 680 (2000). We reject respondent's argument that we should overrule the decision in *In re K.H.,* 313 Ill App. 3d 675 (2000) and find to the contrary.

¶ 47    Turning to the merits, we note that respondent's assertion that "both parties adverse to the parent [referring to the State and the GAL] recommended against a goal change" is misleading.

At the hearing, the State recommended deferral of the decision regarding respondent's efforts and a finding that respondent had not made reasonable progress. The State expressed concerns regarding respondent's potential for making progress given his failure to consistently participate in visitation and lack of participation in required services. Regarding the permanency goal, the State explained "we're asking that the goal remain return home in 12 [months] at this point, but we may be looking at a different goal in the near future." The GAL gave the same recommendation at the hearing and expressed similar concerns, noting: "I am troubled because these children have been in care for so long that changing the goal is clearly on my radar. And but for the fact that [respondent] has this last progress finding, I would be asking the Court to change the goal today." He stated that respondent's "lack of engagement at this time is almost enough to reach a failure to maintain a reasonable degree of interest or concern." However, referring to respondent's reported recent relapse regarding alcohol abuse, the GAL explained he would give respondent one more chance. Under the circumstances, the State's and GAL's cautionary recommendations to maintain the permanency goal cannot be construed as recommendations *against* a goal change.

¶ 48    Furthermore, the permanency-review report reveals that while respondent had engaged in some services, most commendably inpatient treatment for his substance-abuse issue, he failed to engage in required services and otherwise cooperate with DCFS in numerous ways. Respondent did not sign the consents necessary to permit DCFS to collect records or to speak with service providers to confirm his progress in the services. Respondent missed his random drug tests in June and July, and he missed the ACR scheduled for June 16. The report indicates that, by June, respondent had become less involved with the children and the case worker. He missed numerous visits; according to the GAL, respondent missed all of the visits scheduled for June and the first one scheduled for July. According to C.M., respondent participated in only five visits during the

three-month review period. By way of explanation, respondent sent a text message to the caseworker apologizing and stating that he had been very busy. The report indicated that respondent had still not progressed to unsupervised or overnight visitation with the children and he needed to develop parenting skills and protective parenting knowledge.

¶ 49 Most notably, respondent failed to engage in the services required to develop his overall parenting skills as well as the specialized skills required due to the special needs of his children. It was reported that respondent dropped out of parenting classes in September 2021, and it was recommended that he retake parenting classes and parenting coaching on how to parent children with special needs. By the March 28, 2022, permanency-review hearing, respondent still had not successfully completed any parenting education. In fact, the court admonished respondent at that time that during the next review period he needed to resume regular visitation with his children and that there needed to be an assessment of his parenting skills. Although respondent reported that he planned to recommence parenting classes in June 2022, there is nothing in the record to indicate that he did so. At the July 8, 2022, hearing, respondent's counsel acknowledged that respondent failed to engage in parenting education services despite that, based on the observations of the caseworker and foster mother, he was clearly deficient in this area.

¶ 50 The communication from C.M., the grandmother/foster mother, further supports the court's decision. She observed that respondent had missed numerous visits during the three-month review period and otherwise had failed to establish "any kind of relationship with these children or really even attempted to." She stated further that "[t]hey barely know him and he definitely does not know them." She stated that she believes that the children are not a priority to respondent and questioned whether he was responsible enough to care for three young children who have developmental issues.

¶ 51    Section 2-28(2) of the Act requires the court to set a permanency goal that is in the best interests of the children. 705 ILCS 405/2-28(2) (West 2020). In this case, the trial court determined that it was in the best interests of these children that the permanency goal be changed from return home in 12 months to substitute care pending termination of parental rights. After our review, we conclude that the trial court's decision was not contrary to the manifest weight of the evidence.

¶ 52    We next turn to an issue stated, but not argued, in respondent's brief. Respondent listed in his brief the following additional issue on appeal "whether the trial court erred in finding that the State met its burden of proof to establish that it was in the minor's [sic] best interests to terminate [his] parental rights." However, he appears to have abandoned this contention by failing to make any argument or cite any authority in support. "A point raised in an appellant's brief must be supported by argument and relevant legal authority." *People v. Urdiales,* 225 Ill. 2d 354, 420 (2007); see Ill. S. Ct. Rule 341(h)(7) (eff. Oct. 1, 2020). Failure to comply with those requirements results in forfeiture of the issue on appeal. *People v. Ward,* 215 Ill. 2d 317, 322 (2005).

¶ 53    Forfeiture notwithstanding, a review of the record reveals substantial evidence supporting the trial court's determination that it was in the children's best interests to terminate respondent's parental rights. On appeal, this court will not disturb a trial court's finding with respect to a child's best interests unless it is against the manifest weight of the evidence. *In re N.B.,* 2019 IL App (2d) 180797, ¶ 43. In this case, the children have been living with their grandparents for over two years. They are very attached to their grandparents who provide them with a loving and secure home. The grandparents are diligent about ensuring that the children's needs are met, including the special services required due to their developmental and cognitive delays. The children have connections to extended family, and the grandparents expressed interest in respondent being a part

of their lives as long as he can commit to his sobriety. Respondent's own testimony was most compelling. He acknowledged that the grandparents provide for all of the children's daily needs and have consistently taken good care of them. He agreed that the children look to their grandparents for care, love, and support. Respondent testified about his struggles with alcohol addiction, and when asked if he felt he would be able to be a good father to the children, he respondent "I do feel like I could, but not at this time." Based on the forgoing, we conclude that the trial court's decision that it was in the children's best interests to terminate respondent's parental rights was not contrary to the manifest weight of the evidence.

¶ 54                                  III. CONCLUSION

¶ 55    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 56    Affirmed.